# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

CORY PARSON, Individually                   )
and as Personal Representative of the       )
Estate of Robert Lee Parson,                )
                                            )    C.A. No. K19C-07-035 NEP
            Plaintiff,                       )
                                            )
    v.                                       )
                                            )
BRETT S. BLEMLE, PA-C,                       )
ROBERT FRANKEL, M.D.,                        )
BAYHEALTH MEDICAL                            )
CENTER, INC., and BAYHEALTH                  )
EMERGENCY PHYSICIANS, LLC,                   )
                                            )
            Defendants.                      )

Submitted: May 23, 2022
Decided:  June 24, 2022

## MEMORANDUM OPINION AND ORDER

*Plaintiff's Motion in Limine to Exclude Statistical Evidence*
**GRANTED**

*Plaintiff's Motion in Limine to Preclude Irrelevant and Unduly Prejudicial
Testimony of Brett S. Blemle, PA-C's Military Service*
**DENIED**

*Plaintiff's Motion in Limine to Preclude Defendant's Pathology Expert, Michael
Johnson, M.D. From Offering any Opinion or Testimony on Cause of Death or
Possible Causes of Death*
**GRANTED**

*Plaintiff's Motion in Limine to Preclude Testimony or Allusion to Alleged Third
Party Negligence*
**GRANTED**

*Defendant Brett S. Blemle PA-C's Motion in Limine to Preclude Evidence or
Reference to any Alleged Damages Sustained by Tammy L. Riggins*
**GRANTED**

*Defendant Brett S. Blemle, PA-C's Motion In Limine to Preclude Unqualified Standard of Care Testimony of Plaintiff's Expert David Brewster, M.D.*
**DENIED**

*Defendant Robert Frankel, M.D.'s Motion In Limine to Preclude Unqualified Standard of Care Testimony of Plaintiff's Expert David Brewster, M.D.*
**DENIED**

*Defendants Bayhealth Medical Center, Inc. and Bayhealth Emergency Physicians, LLC's Motion In Limine to Exclude Testimony and Argument that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Motion for Summary Judgment as to Agency Claims Regarding Dr. Frankel*
**DENIED**


Kelley M. Huff, Esquire, Shelsby & Leoni, *Attorney for Plaintiff.*

Colleen D. Shields, Esquire, and Alexandra D. Rogin, Esquire, Eckert Seamans Cherin & Mellott, LLC, *Attorneys for Defendant Brett S. Blemle, PA-C.*

Maria R. Granaudo Gesty, Esquire, and Daniel P. Martz, Esquire (of counsel), Burns White, LLC, *Attorneys for Defendant Robert Frankel, M.D.*

James E. Drnec, Esquire, and Katherine J. Sullivan, Esquire, Wharton Levin Ehrmantraut & Klein, P.A., *Attorneys for Defendants Bayhealth Medical Center, Inc., and Bayhealth Emergency Physicians, LLC*.

**Primos, J.**

Before the Court are several motions *in limine* and one motion for summary judgment. This matter involves a healthcare negligence suit filed by Plaintiff Cory Parson (hereinafter "Plaintiff"), individually and as personal representative of the estate of Robert Lee Parson (hereinafter "Decedent"). The Defendants in this case are Brett S. Blemle, PA-C (hereinafter "Mr. Blemle"), Robert Frankel, M.D. (hereinafter "Dr. Frankel"), and Bayhealth Medical Center, Inc., and Bayhealth Emergency Physicians, LLC (hereinafter collectively "Bayhealth").

## I.    FACTUAL AND PROCEDURAL BACKGROUND[1]

Decedent went to Milford Memorial Emergency Department by ambulance, experiencing acute back pain, on May 21, 2018.[2] He had been lying on his bathroom floor for approximately two hours, and each time he had tried to get up, he was stricken with back pain that nearly made him pass out.[3] At the emergency room, he was seen by Mr. Blemle, a physician assistant.[4] Mr. Blemle noted many potential ailments in his differential diagnosis of Decedent, which included the displacement of an inferior vena cava filter (hereinafter "IVC filter").[5] Upon further review, and after ordering scans,[6] at approximately 4:32 p.m. Mr. Blemle diagnosed Decedent

---

[1] The facts are derived from the complaint and the motions *in limine* before this Court and are intended merely to provide a factual background for the motions; therefore, they should not be viewed as uncontroverted facts.

[2] Compl. ¶9.

[3] *Id.*

[4] *Id.* ¶11.

[5] *See* Pl.'s Motion *In Lim.* to Exclude Statistical Evidence, Ex. C, Blemle Dep. Tr. at 84:21–85:20 ("[I] did note that he did have an IVC filter, so I wanted to make sure obviously that's okay. . . . We'll there's always concerns that it's a foreign body in the body and it can move. There's other things that can happen . . .Hemorrhage.").

[6] Compl. ¶13.

"with a lumbar strain and acute left sided low back pain without sciatica," and prescribed various pain medications.[7]

Decedent's fiancée, Tammy Riggins (hereinafter "Ms. Riggins"), picked him up from the hospital, took him to fill his prescriptions, and then took him back to his home.[8] According to the audit report, at 5:53 p.m. that evening, Dr. Frankel, as Mr. Blemle's supervising physician, co-signed Mr. Blemle's charts for Decedent after reviewing them for what appears to be no more than three seconds.[9]

The next morning, Decedent continued to be in pain that caused him, once again, to be unable to move.[10] He sent Ms. Riggins an emergency text message, but by the time Ms. Riggins got a neighbor to check on Decedent, he was unresponsive.[11] Decedent was then transported to the hospital, where he was pronounced dead.[12] According to the autopsy report, the cause of death was "Abdominal Hemorrhage associated with IVC filter displacement."[13]

This memorandum opinion sets forth the Court's decision on the motions following oral argument on May 9, 2022. The Court will begin its analysis by examining the motions *in limine* filed by Plaintiff in this case. The Court will then address Defendants' motions *in limine* and the summary judgment motion.

---

[7] *Id.* ¶15.

[8] *Id.*

[9] Pl.'s Resp. to Bayhealth's Mt. *in Lim.* to Exclude Test. and Arg. that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Motion for Summ. J. as to Agency Claims Regarding Dr. Frankel, Ex. D (showing that Dr. Frankel viewed Decedent's chart at 5:53:37 p.m. and signed the clinical note at 5:53:40 p.m.). There is a dispute among the parties about the interpretation of these documents. *See* Oral Arg. Tr. at 83: 12–14.

[10] Compl. ¶18.

[11] *Id.* ¶19.

[12] *Id.* ¶20.

[13] Compl. ¶21.

## II.    DISCUSSION

### A.  Plaintiff's Motions *in Limine*

### 1.  Motion *in Limine* to Exclude Statistical Evidence

Plaintiff argues that Defendants are planning to offer statistical evidence regarding the rarity of Plaintiff's injury in violation of the rule set forth in *Timblin v. Kent General Hospital*, *Inc.*[14]  The proffered evidence is summarized as follows:

> (1)  From the report of Dr. Jill Baren (Dr. Frankel's expert): "Massive abdominal hemorrhage secondary to rupture of the IVC or aorta or another artery by a displaced IVC filter is **a rare complication** of IVC placement.  Most emergency physicians or emergency department PAs **will never see a patient with this condition**."[15]

> (2) From the report of Dr. Michael Johnson (joint defense expert): "[T]ine or strut perforations [of an IVC filter] . . . "are not uncommon . . . **but uncommonly the cause** of hemorrhaging of the type discovered at autopsy."[16]

In *Timblin*, the Delaware Supreme Court held that the trial court had erred in allowing the defense to present evidence that most patients who experience cardiopulmonary arrest die or suffer brain damage, thus allowing the jury to draw an improper inference that the plaintiff's injuries had not resulted from the defendant's negligence.[17]  The Court found that "[t]he statistical probability of death or brain damage following a cardiac arrest cannot be used to show that [the defendant] acted in conformity with the applicable standard of care."[18]  In *Wong v. Broughton*[19],

---

[14] 640 A.2d 1021, 1022 (Del. 1994).
[15] Pl.'s Mt. *in Lim.* to Exclude Statistical Evidence, Ex. A, Dr. Baren Rpt. at 3.
[16] Pl.'s Mt. *in Lim.* to Exclude Statistical Evidence, Ex. B, Dr. Johnson Rpt. at 4.
[17] 640 A.2d at 1026.
[18] *Id.* at 1024;  *cf. Balan v. Horner*, 706 A.2d 518, 521 (Del. 1998) ("It is settled law that a plaintiff cannot use evidence that a medical procedure had an unusual outcome to create an inference that the proper standard of care was not exercised." (internal quotations and citations omitted)).
[19] 204 A.3d 105 (Del. 2019).

however, the Supreme Court recognized that the use of statistical evidence may be appropriate in a medical negligence case, such as when it relates to the experience of the experts, provides background information, or simply establishes the rarity of the injury.[20]  In the instant case, while the proffered evidence is not "statistical" *per se* (*i.e.*, dealing with percentages or numerical prevalence of a condition), it is similar to statistical evidence in that it focuses on the rarity of a condition.

At oral argument, counsel for Mr. Blemle asserted that the low incidence of the condition (*i.e.*, hemorrhaging caused by IVC displacement) would have made it easier for Mr. Blemle to eliminate IVC displacement from his differential diagnosis as a potential cause of Decedent's lower back pain.[21]  Similarly, counsel for Dr. Frankel argued that the evidence would support the conclusion that Decedent's charts did not raise a red flag when Dr. Frankel was reviewing and signing off on Mr. Blemle's workup.[22]  The factual record, however, supports neither of these arguments.

As to Mr. Blemle, the relevance of the frequency of this sort of hemorrhaging is minimal, given that Mr. Blemle, by his own admission, recognized that the IVC filter was potentially an issue, and specifically that the IVC filter could move and cause hemorrhaging.[23]  Moreover, Mr. Blemle gave no indication in his deposition that he considered the rarity of the condition in determining whether IVC filter displacement had caused Decedent's symptoms.  Finally, Mr. Blemle testified that he eliminated internal hemorrhaging as a potential cause of Decedent's complaints *not* because of the rarity of hemorrhaging resulting from IVC displacement but

---

[20] *Id.* at 110.

[21] Oral Arg. Tr. at 13: 2–14:13.

[22] *Id.* at 21:4-22:23.

[23] Mr. Blemle testified that when attempting to assess the causes of Decedent's condition, he had noted the placement of an IVC filter and "wanted to make sure obviously that's okay," and that he was concerned that the filter might have been displaced.  When asked about any potential dangers if the IVC filter had been displaced, Mr. Blemle answered, without equivocation, "[h]emorrhage."  Pl.'s Motion *in Lim.* to Exclude Statistical Evidence, Ex. C,  Blemle Dep. Tr. at 84:7 to 85:20.

6

because he "did not see any bruising on [Decedent's] back."[24] Thus, in Mr. Blemle's case the relevant inquiry is whether, having recognized the risk of hemorrhage, he breached the standard of care in evaluating and rejecting it as the cause of Decedent's complaints.

Similarly, there is no indication from Dr. Frankel's deposition that he took the rarity of the condition into consideration when considering Decedent's case. Indeed, Dr. Frankel did not even recall reviewing Mr. Blemle's medical charts during his deposition.[25]

In short, because there is no evidence that either Mr. Blemle or Dr. Frankel considered the rarity of the condition in reaching their conclusions in this case, the proffered evidence carries little to no probative value, and that value is substantially outweighed by the dangers of unfair prejudice, confusion of the issues, and misleading the jury. Delaware Rule of Evidence 403 provides that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury . . . ."[26] As the *Timblin* Court noted, "evidence of statistical probability creates a substantial risk of jury confusion and unfair prejudice because such evidence may lead a jury to decide a case based on what happens normally instead of what happened in the case before it."[27] In this case, presentation of evidence of the rarity of hemorrhage caused by IVC displacement could encourage an improper inference on the part of the jury—*e.g.*, that because the condition is rare, Mr. Blemle and Dr. Frankel could be "excused" for failing to deduce that it was the cause of Decedent's complaints, although there is no evidence in the record that

---

[24] Pl.'s Motion *in Lim.* to Exclude Statistical Evidence, Ex. C, Blemle Dep. Tr. at 88:4-6.

[25] Plaintiff's Resp. to Def. Bayhealth's Mt. *in Lim.* to Exclude Test. and Arg. that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Motion for Summ. J. as to Agency Claims Regarding Dr. Frankel, Ex. C, Dep. Tr. of Robert Frankel, M.D. at 24:2, 24:15 (Dr. Frankel repeating that "[he] do[es]n't recall that day.").

[26] D.R.E. 403.

[27] *Timblin*, 640 A.2d at 1025.

either one relied upon that rarity to reach any diagnostic conclusions. In other words, the jury could be tempted to decide the case based on what happens "normally"— *i.e.*, the health care provider eliminates a potential diagnosis based on rarity of a condition—rather than what happened in this case.

The Court finds unpersuasive Mr. Blemle's additional argument that, as in *Wong*, the proffered evidence goes to the "experience" of the experts, provides "background information," or merely shows the rarity of the injury. There is no indication that the evidence has any bearing on the experts' experience or credentials. Moreover, as discussed *supra*, the evidence represents more than mere background or basic information—rather, it is apparent that it would be used to justify Mr. Blemle's and Dr. Frankel's decisions regarding Decedent's treatment, even though there is no evidence that either provider considered it.[28]

Finally, precluding the evidence in question will not prevent Defendants from making other arguments (if supported by expert testimony) that they have advanced in opposition to this motion, including the contention that Decedent was not experiencing hemorrhaging while in the emergency room.[29] In addition, the decision to preclude this evidence is dependent upon the unique facts of this case. A different factual scenario, in another case, could render the challenged information probative.

For the foregoing reasons, the motion is **GRANTED**.

---

[28] The Court also finds unconvincing the argument of Mr. Blemle's counsel that Mr. Blemle was not cross-examined about this point at his deposition because it was a discovery deposition. Mr. Blemle's counsel was certainly not prevented from cross-examining him about the issue if it was felt to be important, and again, it is evident from his direct deposition testimony that he did not consider the rarity of the condition in reaching his diagnosis. *Cf. Vandenbraak v. Alfieri*, 2005 WL 1242158, at *5 (D. Del. May 25, 2005) ("Thus, if the defendants chose not to ask questions [at the discovery deposition of their expert], they must live with that choice. They cannot now be heard to complain about living with the record they had a hand in creating."); *Barrow v. Abramowicz*, 931 A.2d 424, 432 (Del. 2007) (explaining that a defendant cannot complain about the use of a discovery deposition at trial (citation omitted)).

[29] *See* Frankel's Resp. to Pl.'s Mt. *in Lim.* to Exclude Statistical Evidence at ¶ 2.

## 2. Motion *in Limine* to Preclude Irrelevant and Unduly Prejudicial Testimony of Brett S. Blemle, PA-C's Military Service

Plaintiff is seeking to exclude any mention of Mr. Blemle's prior military experience as an Army doctor under DRE 403. Mr. Blemle spent a significant amount of time as an Army medic. Specifically, he joined the Army at eighteen as a combat medic and later deployed with the Army National Guard to Iraq for a year and a half before returning in 2006.[30] Plaintiff argues that the evidence of Mr. Blemle's credentials is "irrelevant" and "unduly prejudicial" because it would garner "unfair sympathy" for Mr. Blemle.[31] For this notion, Plaintiff points to *Sammons v. Doctors for Emergency Services, P.A.*[32]

In *Sammons*, the trial judge had precluded the plaintiff's expert from explaining, during the expert's video-taped deposition, that he would be unavailable for trial because he had been called up for military duty two months before trial.[33] Instead, the trial judge had provided a general explanation regarding witness unavailability to avoid improper sympathy for the expert due to his military service. On appeal, the Supreme Court noted that it was customary for the trial judge to inform the jury that a witness was unavailable and that the reason for the unavailability was irrelevant, and held that the plaintiff had suffered no unfair prejudice from being prevented from informing the jury that the witness was unavailable due to military service.[34]

In this case, by contrast, the issue is not the reason for an expert witness' unavailability, but the basis for the experience and credentials of a defendant in a medical negligence case. While the expert's then-current military service in

---

[30] Pl.'s Mt. *in Lim.* to Preclude Irrelevant and Unduly Prejudicial Test. of Def. Brett S. Blemle, PA.'C's Military Service at 2.
[31] *Id*. at 2–3.
[32] 913 A.2d 519 (Del. 2006).
[33] *Id.* at 537.
[34] *Id.*

9

*Sammons* was irrelevant (*i.e.*, as the explanation for his unavailability), in this case Mr. Blemle's prior medical experience in the military has significant probative value that is not substantially outweighed by the danger of unfair prejudice.

This Court has "broad discretion in determining the relevance of . . . background evidence concerning a witness."[35]   Here, Mr. Blemle's military experience is directly related to his credentials and experience.[36]  It is important for the jury to know that Mr. Blemle gained much of his medical experience in the military, including combat environments, where he would have been exposed to trauma and emergency situations.  The Court further finds that the probative value of this evidence is not substantially outweighed by the danger of unfair prejudice, *i.e.*, the danger that the jury would inappropriately sympathize with Mr. Blemle due to his military service.[37]   Therefore, the motion is **DENIED**.


3. **Motion *in Limine* to Preclude Defendant's Pathology Expert, Michael Johnson, M.D. From Offering any Opinion or Testimony on Cause of Death or Possible Causes of Death**

Generally, when an expert offers a medical opinion, it should be stated in terms of "a reasonable medical probability" or "a reasonable medical certainty."[38]  This includes in-court testimony.

---

[35] *Hignutt v. State*, 958 A.2d 863, 867 (Del. 2008) (quoting *Hull v. State*, 889 A.2d 962, 964 (Del. 2005) (internal quotation marks omitted)).

[36] During oral argument Mr. Blemle's counsel stated that there would be no attempt to argue that "the jury should give [his experience] greater weight [due to his military service], or that he's more credible, or that he's a hero, I'll agree right out of the gates [sic] that we won't attempt to do that sort of improper testimony." Oral Arg. Tr. at 37:13–16.  Plaintiff's counsel responded that this addressed "really . . . what my concern was.  To the extent that it's used simply for background information and to inform his experience level, I have no objection to that. . . ."  Oral Arg. Tr. 38:9–12.

[37] Additionally, Mr. Blemle has been listed as a potential expert in this case, which would render explanation of his experience and credentials important for that reason as well. *See* Second Amended Pre-Trial Stipulation at ¶ 8 (D.I. 126).

[38] *Floray v. State*, 720 A.2d 1132, 1136 (Del. 1998).

In *Floray v. State*, the Supreme Court was reviewing the testimony of an expert concerning whether a child's injuries were "consistent" with sexual abuse.[39] The Supreme Court stated that the questioning was "improperly phrased," *i.e.*, asked in terms of "consistency" rather than medical certainty or probability. However, the Court noted that there was no objection preserved on that ground and examined the testimony in the context of plain error, ultimately upholding admission of the testimony.[40] In *Friedel v. Osunkoya*,[41] this Court did not allow an expert to testify "that there were any other causes of death" because the expert was "not able to testify to a reasonable degree of medical probability."[42] The Court did allow the expert to attack the ultimate conclusion regarding the cause of death, but only due to his appropriately qualified opinion that the autopsy was "inadequately performed."[43]

As this is a motion *in limine*, the Court will determine in advance whether the proffered testimony is properly framed. As a preliminary matter, Dr. Frankel does not intend "to elicit opinions from Dr. Johnson regarding cause of death, which is the primary subject of plaintiff's motion."[44] However, he does plan to elicit testimony relating to 1) whether the IVC filter was the source of Decedent's back pain at the time he entered the ER, 2) whether the terminal event was acute, and 3) whether the injury to the aorta had not occurred when Decedent was in the ER.[45] At

---

[39] *Id.* at 1136 n.17.

[40] *Id.* at 1136–37.

[41] 994 A.2d 746 (Del. Super. 2010)

[42] *Id.* at 750.

[43] *Id.*

[44] Frankel Resp. to Pl.'s Mt. *in Lim.* to Preclude Def.s' Pathology Expert, Michael Johnson, M.D. from Offering An Op. or Test. on Cause of Death or Possible Causes of Death (D.I. 134) at ¶3. Dr. Johnson states in multiple portions of his deposition that he has "not given a cause of death determination" and cannot do so "because [he] think[s] there are some gaps in [his] understanding of what happened." Pl.'s Mt. Lim. to Preclude Def.s' Pathology Expert, Michael Johnson, MD from Offering Any Op. or Test. on Cause of Death or Possible Causes of Death (D.I. 130) Ex. B, Dep. Tr. of Michael Johnson, M.D. Tr. 24:8–9, 24:13–14. Mr. Blemle joined in Dr. Frankel's response. (D.I. 138).

[45] Frankel Resp. to Pl.'s Mt. *in Lim.* to Preclude Def.s' Pathology Expert, Michael Johnson, M.D. from Offering An Op. or Test. on Cause of Death or Possible Causes of Death at ¶5.

oral argument Plaintiff's counsel stated that she does not contest any of these other avenues of testimony.[46] Therefore, the only issue left is whether Dr. Johnson may attack the autopsy report by stating that there are unknown facts such as whether Decedent suffered some type of trauma between his release from the hospital and his death.[47]

As noted *supra*, in *Friedel* the Court allowed the expert to attack the autopsy's ultimate conclusion because the expert offered a competent opinion that the autopsy had been performed inadequately. However, here Dr. Johnson's testimony does not state or allude to the fact that the autopsy was improperly performed. In fact, during his deposition he made various statements that reflect the opposite: 1) "**I'm not disagreeing** with the medical examiner that they [sic] made a reasonable opinion about cause of death";[48] 2) "**I'm not disputing** what the medical examiner said or their [sic] reasoning."[49]

Dr. Johnson's deposition reveals that he feels that there are "uncertainties" about the cause of death because of gaps in information, and that he wishes to point out and explore those uncertainties in his testimony. However, the standard for medical testimony, and experts in general, exists because a jury tends to give greater weight to the words of an expert. This Court has previously stated that

> [a] medical expert may not speculate as to the possible medical causes
> or consequences, and must limit the testimony to causes or
> consequences that are reasonably probable. . . . Such speculation is
> precisely what a Trial Judge is supposed to screen out when exercising
> his gatekeeping role under *Daubert*. . . . It would be very misleading to
> permit the Defendants to confuse the jury by making an unproven

[46] Oral Arg. Tr. 43:23–44:2, 44:8–9 ("And paragraph 7 of Dr. Frankel's response, there's an A, B, and C of opinions to be offered, and I'm not taking any exceptions to those. . . . I'm not disputing that he can't offer that testimony at trial, Your Honor.").
[47] Counsel for Dr. Frankel and for Mr. Blemle agreed during oral argument that such testimony should be allowed, or at least that the Court's decision should be deferred on this issue.
[48] Ex. B, Dep. Tr. of Michael Johnson, M.D. 21:19–22 (emphasis supplied).
[49] *Id.* at 33:23–34:1 (emphasis supplied). *See* Autopsy Report, (attached as Ex. A to Pl.'s Mt. *in Lim.* to Preclude Def.s' Pathology Expert, Michael Johnson, M.D.).

causal connection a defensive sword in the form of an alternative explanation for Plaintiffs' illness.[50]

In this case,  it would be improper to allow a medical expert who concedes in his deposition that he can neither identify another cause of death to a reasonable degree of medical probability or certainty,[51] nor challenge the autopsy's conclusion or performance,[52] to speculate regarding other potential causes of death that are not supported by competent expert testimony.  This motion is **GRANTED**.

4. **Motion *in Limine* to Preclude Testimony or Allusion to Alleged Third Party Negligence**

Plaintiff seeks to preclude any mention of third-party negligence by parties not named in the complaint.  As noted *supra*, an expert in a medical negligence case must give an opinion that meets the requirements of "medical certainty" or "medical probability."   In addition, for an expert to give an opinion regarding a non-physician's breach of the standard of care, the expert must be "familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify."[53]

Defendants point the Court to the testimony of Plaintiff's retained expert, Dr. David Brewster, regarding the radiologist's potential mistakes. The pertinent testimony reads as follows:

---

[50] *Minner v. Am. Mortg. & Guar. Co.*, 791 A.2d 826, 867–68 (Del. Super. 2000).
[51] *E.g.*,  "What I'm saying is that this  person had other medical hist—medical history that was— that were risk factors for sudden death, and in the context of not knowing exactly how this bleeding happened  I'm—I'm not certain that there were not other contributing conditions or perhaps  another primary condition that was underlying this abdomen hemorrhage." Pl.'s Mt. *in Lim.* to Preclude Def.s' Pathology Expert, Michael Johnson, MD, Ex. B, Dep. Tr. of Michael Johnson, M.D. at 21:22–23:6.  Dr. Johnson goes on to theorize that "maybe he fell at home and somehow injured his abdomen and in the process it caused a puncture . . . ." *Id.* at 32:22–24.
[52] *See supra* notes 48–49.
[53] 18 *Del. C.* § 6854.

Q. Did the radiologist who interpreted that scan raise any red flags for the ED personnel about the position of the IVC filter or penetration of struts?

A. Shockingly, the radiologist didn't mention one word about the presence of an IVC filter, let alone any possible complication. So, no, they got no -- from the radiologist, they got no help.

Q. Is it your opinion that the radiologist should have mentioned something?

A. I would think so, but, gosh, you are going to trample on me for giving radiology opinions. Yes, I think he should have seen that. Just as Blemle says he didn't see it, I think Blemle, if he looked at it, should have seen it. But in any case, it was there, even though that scan was not designed to really offer any opinions about a vena cava filter.[54]

This Court, however, has no basis to conclude that Dr. Brewster is qualified to provide expert testimony as to the appropriate standard of care for a radiologist. Indeed, Dr. Brewster impliedly conceded that he is *not* qualified to opine on a radiologist's standard of care when he stated, "[Y]ou are going to trample on me for giving radiology opinions."[55] Moreover, there is no indication that he provided any opinions about the radiologist's actions to a reasonable degree of "medical certainty" or "medical probability"—nor was he asked to do so.

In his response to this motion, Mr. Blemle relies upon *Friedel* for the proposition that a defendant, in challenging the plaintiff's expert opinions, may rely upon opinions of experts that are not rendered to a reasonable degree of medical certainty or probability.[56] This is an incorrect characterization of the holding in *Friedel*. As explained *supra*, in *Friedel*, while this Court allowed the defense expert to attack the conclusion of the autopsy regarding cause of death due to the defense expert's *properly founded* opinion that the autopsy had been improperly performed, the defense expert could not testify regarding other potential causes of death because

---

[54] Def. Frankel's Suppl. Exs. in Supp. of Mts. Relating to Pl.'s Expert, Dr. Brewster, Ex. 1, Dep. Tr. of Dr. Brewster at 41–42 at 43:3–14.

[55] *Id.* at 43:12–13.

[56] Def. Blemle Joinder to Resp. of Def. Frankel to Pl.'s Mt. *in Lim.* to Preclude Defs.' Pathology Expert, Michael Johnson, M.D. from Offering Any Op. or Test. on Cause of Death or Possible Causes of Death (D.I. 138) at 3.

he could not do so to a reasonable degree of medical probability or certainty.[57] Because there is no properly founded opinion before the Court regarding the radiologist's alleged negligence in this case, testimony regarding that negligence, by Dr. Brewster or otherwise, will not be allowed. Accordingly, this motion is **GRANTED**.[58]

### B. Defendants' Motions *in Limine* and Motion for Summary Judgment

### 1. Defendant Blemle's Motion to Preclude Evidence or Reference to any Alleged Damages Sustained by Tammy L. Riggins

Mr. Blemle seeks to preclude Ms. Riggins's testimony related to her damages. Plaintiff argues that there are portions of her testimony that are relevant in describing the days leading up to Decedent's death, but concedes that testimony regarding Ms. Riggins's own emotional or other damages should be precluded.[59]

The Court has reviewed Ms. Riggins's deposition and finds that a substantial portion of her testimony would be relevant to provide the background for the hours leading up to Decedent's death, along with information regarding his back pain that was allegedly misdiagnosed by Mr. Blemle. In addition, Ms. Riggins provides information about the medicines Decedent was taking at the time, their frequency, and the medical conditions that accompanied some of his ailments (*e.g.*, Decedent's

---

[57] 994 A.2d at 750.

[58] This ruling would also apply to any allegations of negligence by employees of the University of Pennsylvania who provided care to Decedent—*i.e.*, without competent expert testimony, no such allegations may be presented to the jury.

In addition, given the Court's decision on this motion, Bayhealth's pending Motion *in Limine* to Preclude Testimony and Argument That Bayhealth Violated the Standard of Care (D.I. 143) has been rendered moot. The Court further notes that Plaintiff was the only party that responded to this motion and took "no position." D.I. 150.

[59] Although Ms. Riggins lived with Decedent, she is not entitled to damages because they were not married. *See* 10 *Del.C.* § 3724 (providing that an action for wrongful death "shall be for the benefit of the spouse, parent, child and siblings of the deceased person").

gout). Finally, due to the death of Decedent, Ms. Riggins, along with Decedent's son, are the only witnesses who have substantial knowledge about Decedent's life that may play a role in the determination of potential damages related to Cory Parson's claim of wrongful death. For instance, Ms. Riggins may testify as to events or circumstances that both she and Cory Parson experienced, and as to Decedent's relationship with his son (*e.g.*, the activities in which they engaged together). By the same token, any testimony by Ms. Riggins about events or circumstances that Cory Parson did *not* experience would be of questionable relevance, and Plaintiff should avoid eliciting such testimony.

For all these reasons, Ms. Riggins will not be excluded as a witness, but she may not speak to her own emotional or financial damages at trial or otherwise provide irrelevant testimony. In addition, the Court will entertain a request from Defendants for an appropriate limiting instruction regarding Ms. Riggins's testimony. Therefore, this motion is **GRANTED** with the indicated clarifications.

2. **Defendant Blemle's and Defendant Frankel's Motions *in Limine* to Preclude Unqualified Standard of Care Testimony of Plaintiff's Expert David Brewster, M.D.**

Plaintiff has identified David Brewster, M.D., as an expert in vascular surgery. Mr. Blemle asserts that Dr. Brewster lacks the expertise required to call into question the decision-making process of an emergency medicine physician assistant when he has not practiced, and does not currently practice in, the field of emergency medicine. In addition, Mr. Blemle contends that, even if admitted, Dr. Brewster's testimony would be needlessly cumulative because Plaintiff has multiple standard-of-care experts. Dr. Frankel argues along similar lines regarding Dr. Brewster's qualifications, but specifically related to his ability to speak to the standard of care of an emergency physician. Finally, Dr. Frankel also argues that Dr. Brewster's testimony would be needlessly cumulative.

16

In a medical negligence case, "No person shall be competent to give expert medical testimony as to applicable standards of skill and care unless such person is familiar with the degree of skill ordinarily employed in the field of medicine on which he or she will testify."[60]  In other words, the proffered expert "[m]ust demonstrate familiarity with the field of medicine practiced by the [treating doctor],"[61]  and "each case must be carefully judged by its particular facts and circumstances."[62]

This case is distinguishable from Mr. Blemle and Dr. Frankel's cited case, *Peters v. Gelb*, as in that case, the proffered expert "had not himself performed the operation in question for some fifteen to twenty years, and [the trial court] held that he was not qualified to testify as an expert in this specialized field of medicine which had undergone recent **material** developments."[63]  Similarly, in *Werner v. Nanticoke Memorial Hospital, Inc.*, the trial court held that a Board-certified neurologist could not testify to the standard of care of an emergency room physician because the neurologist at issue had only moonlighted in the emergency room decades prior to the incident and, as he conceded, many of the standards had changed since then. [64]  In addition, the court noted that the drug at issue in the case was not approved by the FDA until decades after the neurologist had moonlighted in the emergency room.[65]

Neither of these cases aligns factually with the instant one.  Here, Dr. Brewster had last been a consultant in the emergency room four years prior to the incident— not decades—and there is no proffered evidence or testimony that there have been "material" changes or developments in the standard of care related to identifying and

---

[60] 18 *Del. C.* § 6854.
[61] *Werner v. Nanticoke Mem'l Hosp.*, Inc., 2014 WL 5713137, at *2 (Del. Super. Nov. 3, 2014).
[62] *Peters v. Gelb*, 314 A.2d 901, 903 (Del. 1973).
[63] *Id.*
[64] 2014 WL 5713137, at *1.
[65] *Id.*

treating IVC displacement.[66]  In addition, Dr. Brewster has inserted "quite a number of" IVC filters (one hundred or more) and "over the years [has] been consulted in regard to problems with filters."[67]  He testified that the last time he removed a filter was in the "latter part of 2014"—less than four years prior to the incidents in question.[68]  One or two of the filters he removed had "some strut perforations."[69]  More importantly, he is aware of the standard of care for an emergency physician, or physician assistant, when a patient presents possible symptoms related to strut perforation.[70]

Therefore, this is a scenario more akin to that in *Baoust v. Kraut*,[71] where the Supreme Court recognized that "the diagnosis and treatment of some medical problems may be of concern to doctors of different specialties, and in an area of concurrent expertise, a common standard of care may be shared."[72]  In this case, Dr. Brewster's testimony indicated that regardless of the specialty, *i.e.*, emergency physician or vascular surgeon,  there is a commonly shared standard of care to eliminate the potential threat of IVC displacement when evaluating a patient who has an IVC filter and presents with symptoms that are indicative of potential displacement, such as abdominal back pain.[73]

---

[66] Def. Frankel's Suppl. Exs. in Supp. of Mts. Relating to Pl.'s Expert, Dr. Brewster, Ex. 1, Dep. Tr. of Dr. Brewster at 6:1–10:21, 64–65.

[67] *Id.* at 10–12.

[68] *Id.* at 9-12.

[69] *Id.* at 12:11-12.

[70] *Id.* at 65:21–66:4.

[71] 377 A.2d 4 (Del. 1977) (holding that "a specialist in infectious diseases . . . may not competently testify on issues of neurosurgical technique or judgment, just as . . . a neurosurgeon may not competently testify on the proper treatment of infections unrelated to neurological disorders.  But surely,  each may competently testify on the question of whether performance of a particular neurosurgical procedure was necessary to cure or prevent a specific infection.").

[72] *Id.* at 7.

[73] *See* Def. Frankel's Suppl. Exs. in Supp. of Mts. Relating to Pl.'s Expert, Dr. Brewster, Ex. 1, Dep. Tr. of Dr. Brewster at 41–42 (explaining that he stands by his general statement that if a patient with a known IVC filter presents with symptoms of abdominal or back pain, the complication of an IVC filter must be considered and further investigation is required pursuant to the standard of care).

In addition, "[i]t is well established in Delaware that a physician may offer an opinion on the standard of care of a non-physician, such as a physician's assistant . . . ."[74] "A physician need only establish his or her familiarity with the degree of skill ordinarily employed by a practitioner of the type about which he or she will be offering an opinion, in order for the opinion to be judicially acceptable."[75] This Court finds that Dr. Brewster has demonstrated his familiarity with the skill ordinarily employed by a physician assistant, and is qualified to opine regarding the standard of care for Mr. Blemle in this case.[76]

With regard to Dr. Frankel, Dr. Brewster is aware that an emergency physician is "required to review—if not see the patient, he is required to at least review the record of all patients seen by his, by physician extenders [sic] under his supervision. He is required to review those within 24 hours."[77] In addition, the Court finds unpersuasive Dr. Frankel's argument that Dr. Brewster's lack of experience with the interpretation of audit trails disqualifies him from speaking to the issues in this case. Thus, Dr. Brewster is qualified to render a standard of care opinion regarding Dr. Frankel's supervisory capacity in this case.

Lastly, the Court addresses Mr. Blemle's argument that Dr. Brewster's testimony would be needlessly cumulative. The fact that two medical experts have

---

[74] *Dishmon v. Fucci*, 32 A.3d 338, 343 (Del. 2011) (citing *Divita v. Sweeney,* 2010 WL 5313492 at *2 (Del. Super. Nov. 29, 2010)).

[75] *Id.* (citing *Divita,* 2010 WL 5313492, at *2).

[76] *See* Dep. Tr. of Dr. Brewster at 41–42 (outlining his reasoning and familiarity with the standard for a PA and specifically as that standard relates to Mr. Blemle's actions). In this matter the PA, Mr. Blemle, acknowledged that there was a risk of hemorrhaging from the IVC filter, and thus the standard of care issue relates to whether the PA made the correct decision regarding how to eliminate or ameliorate that risk. This standard is shared across disciplines, *i.e.*, whether one is in an emergency room or doctor's office, the proper method of ascertaining the risk of a certain adverse outcome for the patient is the same. *Compare id.* at 38:3–12 (explaining that there is crossover between his specialty and others that has allowed him to offer opinions outside vascular surgery) *with id*. at 42, 45:23–46:1 (explaining that the presentation of Decedent's symptoms in all cases requires that the complication of an IVC filter be considered and further investigation is required, and "at the very least," the situation entails a consultation with a vascular surgeon to evaluate whether the back pain is being caused by the IVC filter).

[77] *Id.* at 65:10–15.

19

overlapping testimony, although potentially cumulative, does not render the testimony of one of the experts inadmissible.[78] Moreover, limiting a party's presentation of evidence on this ground should be done "sparingly."[79] If the excluded evidence goes to the "heart" of the plaintiff's case, even if it had the same "general character" as other evidence, it could warrant a new trial.[80] Accordingly, the Court finds that Dr. Brewster's testimony goes to the heart of the issue in this case, is material to Plaintiff's theory, and is not inappropriately cumulative, particularly given the complexity of this action. Therefore, the motions of Mr. Blemle and Dr. Frankel on this subject are **DENIED**.

3. **Bayhealth's Motion *in Limine* to Exclude Testimony and Argument that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Motion for Summary Judgment as to Agency Claims Regarding Dr. Frankel**

Generally, when reviewing a motion for summary judgment pursuant to Delaware Superior Court Civil Rule 56, the Court must determine whether any genuine issues of material fact exist.[81] If there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law, summary judgment is appropriate.[82] The moving party bears the initial burden of showing that there are no genuine issues of material fact; when such a showing is supported in the motion, the burden then shifts to the nonmoving party to show that there are material issues of fact in dispute.[83] Furthermore, the Court must draw all factual inferences in a

---

[78] *Galmore v. St. Francis Hosp.*, 2011 WL 2083888, at *2 (Del. Super. Ct. Apr. 27, 2011) (citation omitted).
[79] *Barrow v. Abramowicz*, 931 A.2d 424, 430 (Del. 2007) (citation omitted).
[80] *Green v. Alfred A.I. duPont Inst. of Nemours Found.*, 759 A.2d 1060, 1063 (Del. 2000) (citing *Watts v. Delaware Coach Co.*, 58 A.2d 689, 696 (Del. Super. 1948)).
[81] Super. Ct. Civ. R. 56(c); *Wilmington Trust Co. v. Aetna*, 690 A.2d 914, 916 (Del. 1996).
[82] Super. Ct. Civ. R. 56(c); *Moore v. Sizemore*, 405 A.2d 679, 680 (Del. 1979)
[83] *Sizemore*, 405 A.2d at 681.

light most favorable to the non-moving party.[84] Therefore, summary judgment will not be granted if it appears that there are material facts in dispute or that further inquiry into the facts would be appropriate "in order to clarify the application of the law to the circumstances."[85]

Looking first to the issue of whether an actual agency relationship existed, the plaintiff must demonstrate that the employer/hospital controlled or had the right to control the conduct of the servant/physician in the performance of the servant/physician's work.[86] It is well settled in Delaware that general agency principles apply to hospitals and physicians.[87] "Where there is sufficient evidence establishing the requisite right of control, the trier of fact may find that the physician is an agent of the hospital and thus impose vicarious liability on the hospital."[88] "However, if the requisite right of control does not exist, the physician is considered an independent contractor and the hospital is generally not liable for the negligence of an independent contractor."[89] Thus, the level of control a hospital exerts over a physician is a determinative factor with regard to a physician's classification.[90] The determination of whether an agency relationship exists depends on the specific facts of the case. Delaware courts have "recognize[d] that no single rule could be laid down to determine whether a given relationship is that of [a servant to a master] as distinguished from an independent contractor."[91] Rather, such determinations should ordinarily be made by the fact-finder.[92]

---

[84] *Alabi v. DHL Airways, Inc.,* 583 A.2d 1358, 1361 (Del. 1990); *Merrill v. Crothall-Am., Inc.*, 606 A.2d 96, 100 (Del. 1992).

[85] *Ebersole v. Lowengrub*, 180 A.2d 467, 470 (Del. 1962).

[86] *Dunn v. Atlantic Surgical Associates, LLC*, 2007 WL 1784093, at *1 (Del. Super. Apr. 27, 2007). (citing *Fulton v. Quinn*, 1993 WL 19674, at *3 (Del. Super. Jan. 12, 1993)).

[87] *Id.*

[88] *Fulton*, 1993 WL 19674, at *3.

[89] *Id*.

[90] *Id*.

[91] *Murphy v. Bayhealth, Inc.*, 2005 WL 578823, at *3 (Del. Super. Feb. 4, 2005) (quoting *White v. Gulf Oil Corp.*, 406 A.2d 48, 51 (Del. 1979)).

[92] *Id.*

In this case, Plaintiff argues that control can be found by virtue of both (1) the contract Dr. Frankel signed with Bayhealth, and (2) Dr. Frankel's supervisory responsibility over Mr. Blemle, who is a Bayhealth employee. Bayhealth argues that Dr. Frankel's testimony reveals that he was a "locum physician" hired by a company independent from Bayhealth, *i.e.* Weatherby, to fill in as a physician at Bayhealth for prescribed periods.[93]

Here, the testimony indicates that Dr. Frankel worked the same shift as Bayhealth employees.[94] These work hours, although provided to Dr. Frankel by Weatherby, were ultimately "accepted" and "determined" by Bayhealth.[95] In addition, Dr. Frankel stated that he was governed by the rules and regulations of Bayhealth, and although he could not remember the specific rules, he knew that they governed his supervisory relationship with Mr. Blemle.[96] There is also Mr. Blemle's Collaborative Agreement, which, although not signed by Dr. Frankel, mandates clear responsibilities and work performance expectations for the supervisor of a physician assistant.[97] For these reasons, the Court finds that there is a genuine issue of material fact regarding whether Dr. Frankel was the actual agent of Bayhealth. Therefore, the determination of Dr. Frankel's agency relationship with Bayhealth must be left to the jury. It therefore follows that testimony and argument that Dr. Frankel was

---

[93] Pl.'s Resp. to Def. Bayhealth's Mt. *in Lim.* to Exclude Test. and Arg. that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Mt. for Summ. J. as to Agency Claims Regarding Dr. Frankel, Ex. C, Dep. Tr. of Robert Frankel, M.D. at 17–18.

[94] *See id.* at 16:20–24 (testifying that he believed he worked the "day shift," *i.e.*, 7 a.m. to 7 p.m.).

[95] Defendant Robert Frankel, MD's Resp. in Opposition, (D.I. 135), at ¶10 (" Pursuant to that contract, upon Bayhealth's specific request for Emergency Physician coverage for specifically identified shift assignments (date, time and location), Weatherby offered Dr. Frankel, who [sic] Bayhealth accepted. The finality of the arrangement was conditioned upon the granting of staff privileges to Dr. Frankel by Bayhealth. While Dr. Frankel received confirmation of his assignment from Weatherby, the dates, times and locations repeated by Weatherby in the assignment letter were determined by Bayhealth. Bayhealth retained the right to terminate the physician assignment for just cause").

[96] Dep. Tr. of Robert Frankel, M.D. at 26:19–27:6.

[97] Pl.'s Resp. to Bayhealth's Motion to Exclude (D.I. 136), Ex. B.

the agent of Bayhealth at all relevant times will not be excluded. For these reasons, Bayhealth's motion is **DENIED**.[98]

## III. CONCLUSION

For the reasons discussed above:

I.    Plaintiff's Motion *in Limine* to Exclude Statistical Evidence is **GRANTED.**

II.    Plaintiff's Motion *in Limine* to Preclude Irrelevant and Unduly Prejudicial Testimony of Brett S. Blemle, PA-C's Military Service is **DENIED**.

III.    Plaintiff's Motion *in Limine* to preclude Defendant's Pathology Expert, Michael Johnson, M.D. From Offering any Opinion or Testimony on Cause of Death or Possible Causes of Death is **GRANTED.**

IV.    Plaintiff's Motion *in Limine* to Preclude Testimony or Allusion to Alleged Third Party Negligence is **GRANTED.**

V.    Defendant Brett S. Blemle PA-C's Motion *in Limine* to Preclude Evidence or Reference to any Alleged Damages Sustained by Tammy L. Riggins is **GRANTED.**

VI.    Defendant Brett S. Blemle PA-C's Motion *in Limine* to Preclude Unqualified Standard of Care Testimony of Plaintiff's Expert David Brewster, M.D. is **DENIED.**

VII.    Defendant's Robert Frankel, MD's Motion *in Limine* to Preclude Unqualified Standard of Care Testimony of Plaintiff's Expert David Brewster, M.D. is **DENIED.**

VIII.    Defendant Bayhealth Medical Center, Inc. and Bayhealth Emergency Physicians, LLC's Motion *in Limine* to Exclude Testimony and Argument that Dr. Frankel is Their Agent or Apparent Agent, or in the Alternative, Motion for Summary Judgment as to Agency Claims Regarding Dr. Frankel is **DENIED.**

---

[98] Plaintiff's counsel stated that she will not be arguing apparent agency and that she is "focused on actual agency." Oral Arg. Tr. at 105:10–11. Dr. Frankel's counsel stated that he does "not intend . . . to elicit testimony or evidence" regarding apparent agency and that it is a "moot issue." *Id.* at 108:11–15. Therefore, the Court need not address that issue.

In addition, given the disposition of Plaintiff's Motion regarding third party negligence, Bayhealth's Motion *in Limine* to Preclude Testimony and Argument That Bayhealth Violated the Standard of Care is rendered **MOOT**.

**IT IS SO ORDERED**.

_____
Noel Eason Primos, Judge

NEP:tls
*Via File & ServeXpress*
oc:    Prothonotary
cc:    Counsel of Record